UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LUCIUS R. ALLEN,                                    CIVIL NO. 08-6366 (JNE/JSM)

        Plaintiff,

v.                                                  <u>REPORT AND
                                                    RECOMMENDATION</u>

KAREN JUSSILA,
et al.,

        Defendants.

JANIE S. MAYERON, United States Magistrate Judge.

        The above matter came before the undersigned United States Magistrate Judge

upon the Motion to Dismiss and for Summary Judgment of Defendants Agrimson,

Helmaniak, Jonk, Larson, Nelson, Reid, Symmes, Tagawa, and Thielen [Docket

No. 46], Defendant Stephen Craane, M.D.'s Motion for Summary Judgment [Docket No.

55], and upon Defendants Dr. Michael Koeplin and Dr. Joshua Colton's Motion for

Summary Judgment [Docket No. 61].  This matter has been referred to the undersigned

Magistrate Judge for a Report and Recommendation by the District Court pursuant to

28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(a).

## I.      GENERAL FACTUAL BACKGROUND

        Plaintiff Lucius R. Allen is currently a federal prisoner at the Federal Correctional

Institution ("FCI-Memphis") in Memphis, Tennessee.  From February 15, 2005 until

October 3, 2007, Allen was incarcerated at Minnesota Correctional Facility in Oak Park

Heights, Minnesota ("MCF-Oak Park Heights") due to housing issues within the federal

prison system. Affidavit of Barbara Stoltz, ¶ 5 [Docket No. 53]. On October 3, 2007, he was transferred out of MCF-Oak Park Heights and arrived at the United States Penitentiary in Coleman, Florida ("USP-Coleman") on November 20, 2007. See Complaint, p. 25; Jussila Decl., ¶ 11; Declaration of Alicia Vasquez, ¶ 10. On July 14, 2009, Allen was transferred to FCI-Memphis. See Motion/Request for Extension [Docket No. 40].

Allen brought the present suit against Dr. Michael B. Koeplin, John Agrimson, Kathy Reid, Dr. Stephen Craane, B.J. Helmaniak, Judy Ellerbusch, Barb Nelson, Officer Tagawa, Officer Teresa Jonk, Nanette Larson, Mark Thielen, Dr. Joshua B. Colton, Karen Jussila, and Warden Jessica Simms.[1]

Pursuant to 42 U.S.C. §1983, Allen alleged Eighth and Fourteenth Amendment violations. Allen suffered from hemorrhoids and his Complaint stems from the medical care he received while incarcerated at MCF-Oak Park Heights. Three claims can be discerned from the Complaint: first, Allen received inadequate medical treatment from defendants; second, Allen was transferred from MCF-Oak Park Heights to USP-Coleman in retaliation for filing grievances and for indicating that he planned to file a lawsuit; and third, MCF-Oak Park Heights did not send Allen's medical records to USP-Coleman and did not inform the Bureau of Prisons of his medical problems. Pl.'s Mem. in Support of Complaint, p. 25 [Docket No. 4].

---

[1]    On February 12, 2010, this Court recommended granting defendant Karen Jussila's Motion to Dismiss or in the Alternative for Summary Judgment, and dismissal of Judy Ellerbusch without prejudice. Report and Recommendation dated February 12, 2010 [Docket No. 95]. On April 19, 2010, District Court Judge Ericksen adopted the Report and Recommendation. [Docket No. 122]. On July 8, 2010, the Court of Appeals dismissed Allen's appeal of this decision on grounds that it was premature. See Docket No. 134.

Allen requested relief in the form of a declaratory judgment stating that the defendants violated the Eighth Amendment prohibition against cruel and unusual punishment and the due process clause of the Fourteenth Amendment, compensatory damages in the amount of $250,000 jointly and separately against all defendants, and punitive damages in the amount of $1,500,000 against each defendant. Pl.'s Mem. in Support of Complaint, pp. 27-28.

In lieu of answering the Complaint, Minnesota Department of Corrections defendants John Agrimson, Kathy Reid, B.J. Helmaniak, Barb Nelson, Officer Tagawa, Officer Teresa Jonk, Nanette Larson, Mark Thielen, and Warden Jessica Simms ("DOC Defendants") brought a motion to dismiss under Rule 12 of the Federal Rules of Civil Procedure, and in the alternative, a motion for summary judgment pursuant to Rule 56. [Docket No. 47]. The other defendants – Dr. Steven Craane, and Drs. Michael Koeplin and Dr. Joshua Colton – also have moved for summary judgment.

## II.    STANDARD OF REVIEW

### A.    <u>Rule 12(b)(6) Motion to Dismiss</u>

In considering a motion to dismiss under Rule 12(b)(6), the pleadings are construed in the light most favorable to the nonmoving party, and the facts alleged in the complaint must be taken as true. <u>Hamm v. Groose</u>, 15 F.3d 110, 112 (8th Cir. 1994). In addition, "the court must resolve any ambiguities concerning the sufficiency of the plaintiffs' claims in favor of the plaintiffs, and give the plaintiffs the benefit of every reasonable inference drawn from the well-pleaded facts and allegations in their complaint." <u>Ossman v. Diana Corp</u>., 825 F. Supp. 870, 880 (D. Minn. 1993) (internal quotation marks and citations omitted). At the same time, to withstand a motion to

dismiss under Rule 12(b)(6), litigants must properly plead their claims under Rule 8 of the Federal Rules of Civil Procedure and meet the principles recently articulated by the United States Supreme Court in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) and Ashcroft v. Iqbal, 129 S.Ct. 1937 (2009).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." This pleading requirement does not require detailed factual allegations. Martin v. ReliaStar Life Ins. Co., Civil No. 09-01578 (MJD/AJB), 2010 WL 1840877 at *8 (D. Minn. 2010) (citing Twombly, 550 U.S. at 555). On the other hand, a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 555). Thus, to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S., at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 556). "Determining whether a complaint states a plausible claim for relief will,... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 129 S. Ct. at 1950.

In summary, the pleading standard articulated by Rule 8 "does not require detailed factual allegations, but it [does demand] more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. at 1949 (internal quotation marks and citations omitted). In making this determination, the Court must read the allegations of

the proposed amended complaint as a whole, as opposed to parsing the allegations "piece by piece to determine whether each allegation, in isolation, is plausible." Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 594 (8th Cir. 2009) (citations omitted).

As a general rule, the Court may not consider materials "outside the pleadings" on a motion to dismiss. However, a court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss. Wickner v. McComb, 2010 WL 610913 at *5 (D. Minn. 2010) (citing Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999).

Pro se complaints are held to less stringent standards than formal pleadings drafted by lawyers. See Haines v. Kerner, 404 U.S. 519, 520 (1972) (per curiam). Nevertheless, even a pro se complaint must allege facts, and not just bare, unsupported, legal conclusions. Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir.1985) ("[a]lthough it is to be liberally construed, a pro se complaint must contain specific facts supporting its conclusions"); Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir.1995) ("[a]t the very least ... the complaint must contain facts which state a claim as a matter of law and must not be conclusory").

## B.    Summary Judgment

Summary judgment is proper when, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The moving party bears the burden of showing that there are no genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S.

317, 322-23 (1986). If the moving party carries its burden, the nonmoving party must point to specific facts in the record that create a genuine issue for trial. <u>Anderson</u>, 477 U.S. at 256. The non-moving party must "substantiate his allegations with sufficient probative evidence that would permit a finding in [their] favor based on more than mere speculation, conjecture, or fantasy." <u>Wilson v. Int'l. Bus. Mach. Corp.</u>, 62 F.3d 237, 241 (8th Cir. 1995).

Here, the DOC Defendants have submitted materials outside of the pleadings for consideration by the Court. Therefore, this Court converts the DOC Defendants' motion to dismiss into a motion for summary judgment. <u>See</u> Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); <u>see</u> <u>also</u> <u>McAuley v. Federal Ins. Co.</u>, 500 F.3d 784, 787 (8th Cir. 2007) ("We have previously held that 'Rule 12(b)(6) itself provides that when matters outside the pleadings are presented and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56.' Such 'matters outside the pleadings' include both statements of counsel at oral argument raising new facts not alleged in the pleadings, and 'any written or oral evidence in support of or in opposition to the pleading that provide some substantiation for and does not merely reiterate what is said in the pleadings.'" <u>Gibb v. Scott</u>, 958 F.2d 814, 816 (1992) (quoting 5C Wright & Miller, Federal Practice and Procedure § 1366)) (internal citations omitted)").

## III. THE DOC DEFENDANTS MOTION TO DISMISS AND FOR SUMMARY JUDGMENT [DOCKET NO. 46]

In support of their motion to dismiss or in the alternative, a motion for summary judgment pursuant to Rule 56, the DOC Defendants made the following arguments: 1) Allen's claims must be dismissed because he failed to exhaust his administrative remedies; 2) Allen's claims for damages against the DOC Defendants in their official capacities should be dismissed because they are barred by the Eleventh Amendment and not available under Section 1983; 3) Allen is not entitled to compensatory damages for psychological or emotional suffering; 4) Allen's claims against defendant Jonk must be dismissed because he failed to state allegations sufficient to support a claim for relief; 5) summary judgment should be granted because the DOC Defendants did not violate Allen's constitutional rights; 6) the DOC Defendants were not deliberately indifferent to Allen's medical needs under the Eighth Amendment; 7) Allen's claims against Defendant Tagawa must be dismissed because he did not work the dates on which Allen alleged he was deliberately indifferent to his medical needs; 8) Allen cannot state a claim based on his transfer to federal prison; and 9) the DOC Defendants are protected by qualified immunity. DOC Def. Mem. in Support, pp. 7-22.

The Court finds that it is not necessary to address the DOC Defendants' various substantive arguments because, based on the undisputed record, Allen has failed to exhaust his administrative remedies as required by the PLRA, and his suit against the DOC Defendants must be dismissed on that ground.

Section 1997e(a), which was enacted in 1996 as part of the Prison Litigation Reform Act of 1995, ("the PLRA"), provides:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This statute requires that prisoners must exhaust all of their available administrative remedies before they can bring a civil rights action based on the conditions of their imprisonment. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes," Porter v. Nussle, 534 U.S. 516, 524, 532 (2002), and regardless of the nature of the claim or the relief the prisoner is seeking. See Booth v. Churner, 532 U.S. 731, 741 (2001). Exhaustion under the PLRA requires "proper exhaustion," which "demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Woodford v. Ngo, 548 U.S. 81, 90-91 (2006) (emphasis added). In other words, "proper exhaustion" of administrative remedies, "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Id. at 90 (quotation and marks omitted). Drawing on the concepts of exhaustion in the context of habeas corpus cases, Woodford stands for the proposition that the exhaustion requirement may not be satisfied by filing an untimely grievance or otherwise procedurally defective appeal. See Woodford, 548 U.S. at 92-93.

As to the purpose of this requirement, the Eighth Circuit has explained:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing

> the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. In other instances, the internal review might filter out some frivolous claims. And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.

Johnson v. Jones, 340 F.3d 624, 626-27 (8th Cir. 2003); see also Woodford, 548 U.S. at 89 ("Exhaustion of administrative remedies serves two main purposes. First, exhaustion protects 'administrative agency authority.' Exhaustion gives an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,' and it discourages 'disregard of [the agency's] procedures.' Second, exhaustion promotes efficiency.") (quotation and citations omitted); Alexander v. Hawk, 159 F.3d 1321, 1324 (11th Cir. 1998) (quoting 141 Cong. Rec. H1472-06, *H1480 (daily ed. Feb. 9, 1995)) ("Congress intended section 1997e(a) to 'curtail the ability of prisoners to bring frivolous and malicious lawsuits by forcing prisoners to exhaust all administrative remedies before bringing suit in Federal court.'"). However, under the PLRA, failure to exhaust the available administrative remedies is an affirmative defense, with the burden of proof falling on defendant, and not a matter of subject matter jurisdiction. Lenz v. Wade, 490 F.3d 991, 993 n. 2 (8th Cir. 2007) (citing Jones v. Bock, 549 U.S. 199, 127 S.Ct. 910, 919-922, 166 L.Ed.2d 798 (2007); see also Nixon v. Sanders, No. 06-1013, 2007 WL 2349344 at *1 (8th Cir. Aug. 17, 2007).

If it is established that exhaustion of administrative remedies did not occur prior to filing of the suit, both the Supreme Court and Eighth Circuit have made it clear that dismissal is mandatory. Jones, 549 U.S. at 211 ("[t]here is no question that exhaustion [of administrative remedies] is mandatory under the PLRA and that unexhausted claims

cannot be brought in court"); Woodford, 548 U.S. at 85 ("[e]xhaustion is no longer left to the discretion of the district court, but is mandatory"); Johnson, 340 F.3d at 627-28 (finding that if a prisoner does not exhaust his administrative remedies before filing a complaint in federal court, "dismissal is mandatory," and even if a prisoner subsequently satisfies the exhaustion requirement while his action is still pending, the case still must be dismissed).

The formal grievance procedure adopted by the Minnesota Department of Corrections ("MNDOC") prescribes a set of administrative remedies that are available to Minnesota state prison inmates. See Ebeling Aff., Exhibit A (Grievance Procedure, DOC Policy No. 303.100, versions dated May 1, 2005, June 6, 2006 and June 5, 2007).[2] Pursuant to the policy, inmates must first seek to resolve their grievances informally, by sending a "kite," (i.e., a short written note), to a pertinent prison staff member. Id. If the kite does not resolve the grievance to the inmate's satisfaction, then the inmate must prepare and submit a formal "Offender Grievance form" to the "facility grievance coordinator." Id., p. 2. The formal grievance is investigated by the facility grievance coordinator, who submits the results of his or her investigation to the prison warden/superintendent or designee. Id. The warden/superintendent (or designee) then rules on the grievance, and the facility grievance coordinator provides written notification to the offender of the warden/superintendent's (or designee's) decision within 20 working days from the date the grievance was logged into the grievance database. Id. The warden/superintendent (or designee) may obtain a 20-working day

---

[2] A review of these three policies indicates that the grievance procedure for the MNDOC has remained substantially the same since 2005 – the offender first attempts to resolve the issue through kites, and then initiates a formal grievance, followed by a grievance appeal if he or she is still dissatisfied with the response from prison officials.

extension provided the offender is notified of the extension within the first 20 working days. Id., p. 3. If the offender does not receive a decision within 20 working days of the date the grievance was logged, or within 40 days if the offender received notice of an extension, the offender may consider the grievance dismissed and the offender may appeal the grievance immediately. Id.

If the inmate is dissatisfied with the decision of the warden/superintendent (or designee), he can appeal that decision by submitting a formal Grievance Appeal form to the DOC's "central office grievance appeal coordinator" within 15 working days of the date the warden/superintendent (or designee) signed the response. Id. That person will "[d]etermine the appropriate method of investigating the grievance and submit the investigation results with recommendation to the appropriate assistant or deputy commissioner." Id. The assistant or deputy commissioner then makes a final decision on the grievance. Id., p. 4. The assistant or deputy commissioner will respond to the appeal within 20 working days from the date the appeal was logged, and may obtain a one-time 20-working day extension, provided the offender is notified of the extension within the first 20 working days. Id. If the offender does not receive a decision within 20 working days of the date the grievance was logged, or within 40 days if the offender received a notice of extension, the offender may consider the grievance appeal dismissed and the offender may report the matter to the Commissioner for a resolution. Id. Once a grievance has been resolved by the assistant or deputy commissioner or the Commissioner, there are no further appeals. Id. The policy explicitly instructs the offender to "follow the chain of command and contact only one staff at a time." Id., p. 1.

The grievance policy also permits offenders who have been threatened or are in danger to submit their complaint directly to the central office grievance appeal coordinator for response by the assistant or deputy commissioner. Id., p. 3. Under these circumstances, all such decisions processed by the central office are final and there is no second level of appeal. Id.

In summary, the administrative remedies provided by MNDOC are fully exhausted for purposes of § 1997e(a) only when an inmate completes all of the prescribed steps of the MNDOC Grievance Procedure, and receives a final decision from the assistant or deputy commissioner or Commissioner.

Allen has supplied various kites and grievances regarding his medical care that he filed when he was incarcerated at MCF-Oak Park Heights. See Offender Kite Forms and Offender Grievance Forms dated April 4, 2006, April 11, 2006, April 26, 2006, May 30, 2006, September 25, 2006, October 19, 2006, November 20, 2006, and June 19, 2007, attached as Exhibits to Complaint [Docket No. 4-1]. All of the offender grievances filed by Allen relate to his medical concerns, and none of them mention a retaliatory transfer or failure to send his medical files to USP-Coleman. Id. Allen filed four total offender grievances related to his medical care.[3]

Allen's first grievance was submitted on April 26, 2006. Exhibits to Complaint, p. 9 [Docket 4-1]. In this grievance, Allen reported the following: he had surgery for hemorrhoids on March 16, 2006. On April 4, 2006, Allen had a checkup and was told

---

[3]     The DOC Defendants provided only three grievances in their moving papers. See Ex. B to Ebeling Aff. (Grievance Reports). Allen provided one grievance not included by the DOC Defendants. See Offender Grievance dated November 20, 2006, Exhibits to Complaint, p. 30. The Court has considered all four grievances.

that a couple of the incisions remained unhealed and that he would receive a prescription for Vicodin for pain and instructed to take sitz baths to aid in healing.  Upon his return to the TCU[4], he was informed that he was being returned back to a regular population unit.  Allen felt the early discharge posed a threat to his health, and he submitted a kite on April 4, 2006 addressing his concerns.  On April 10 and 11, Allen submitted kites regarding his surgery for hemorrhoids, complaining about escalating pain and bleeding.  He was seen by Dr. Aye Khin and told he had an infection and was prescribed an antibiotic and ibuprofen.  Allen was unable to take the necessary sitz baths with the portable basin and water bag he was given because the basin was too large for the toilet bowl in his cell and his cell did not provide hot water.  Allen explained to Dr. Khin his difficulties with the portable sitz bath.  On April 25, 2006, Allen was seen by Dr. Craane, who spoke with the nurse supervisor regarding arrangements for the sitz baths.  As of April 26, 2006, Allen had not had his sitz baths.

In response to the first grievance, Supervisor Kathy Reid determined that Allen was instructed to continue with his antibiotics and was issued a tube of antibiotic salve to place on the affected area, and issued two portable sitz bath basins for use in his cell.  Grievance Response dated May 3, 2006 (Exhibits to Complaint, p. 11).  The maintenance director informed Reid that the water in Allen's cell was set to reach 115 degrees.  Warm water was available at all times and warm water was enough to accomplish Allen's sitz baths.  Reid dismissed the grievance on May 3, 2006.  Id., p. 12.

Allen filed a second grievance on October 19, 2006.  Exhibits to Complaint, p. 24.  Allen stated that on May 25, 2006, he spoke with Barb Nelson and was told that he

---

[4]     TCU stands for "Transitional Care Unit."

would be allowed to take proper sitz baths in the Transitional Care Unit. The following day, Allen went to the medical department to begin the sitz baths, but Nurse Helmaniak stated Allen could only use the portable sitz basin. On May 27, 2006, Allen spoke with Nelson again, who said he could begin proper sitz baths that day. The same day, Allen requested that Officer Tagawa contact the Transitional Care Unit and find out the appointed time for his sitz bath. Officer Tagawa was informed Allen needed written authorization. On May 30, 2006, Officer Jonk received an expired authorization for sitz baths for May 27 and May 28, with an expiration date of May 29, 2006. Allen stated he was never permitted to take any sitz baths. Allen was seen by Nurse Ellerbusch on August 4, 2006, who reported a fissure and drainage, prescribed antibiotics, and submitted a written request for Allen to see a surgeon. On September 1, 2006, Allen underwent a second surgery. Upon his return on September 2, 2006, he was denied proper medical care by Helmaniak. Allen requested that Supervisor Kathy Reid, Dr. Craane, Supervisor Barb Nelson, and Nurse Helmaniak be disciplined for unprofessional conduct and incompetence.

In response to this October 19, 2006 grievance, Reid determined that after his surgery on March 16, 2006, Allen was issued a sitz bath basin for use in his cell when he was discharged back to the general population on April 4, 2006. Grievance Response dated November 2, 2006 (Exhibits to Complaint, p. 27). Reid also found that Allen's recovery was monitored by Dr. Craane in the outpatient clinic, and documentation existed that Allen's wound was healing with a medical management plan. Allen had a second surgery to the same area on September 1, 2006, and continued to be monitored for his medical needs on a regular basis. Reid found that the

actions of staff were professional and competent, and denied the grievance on November 2, 2006.

Allen filed a third grievance on November 20, 2006, addressing it specifically to John Agrimson.[5]  Exhibits to Complaint, p. 30.  In this grievance, Allen reiterated his earlier complaints from his second grievance about not being able to take sitz baths as ordered by his surgeon, his early discharge from the TCU, the sitz bath attachment he was given would not fit over the toilet in his cell, and Nurse Helmaniak's interference. Allen again requested that the staff be disciplined for their unprofessional conduct and incompetence, and a letter of reprimand be placed in their personnel files.

On January 22, 2007, Agrimson wrote Allen a letter informing him that he needed additional time to review Allen's file more extensively.  Exhibits to Complaint, p. 38.  On April 4, 2007, Agrimson again wrote to Allen in response to his grievance, and stated that he completed his review of Allen's file.  Id., p. 42.  Agrimson informed Allen that the Nursing Supervisor tested the sitz bath apparatus and it fit correctly on all of the toilet seats in each of the complexes.  Furthermore, Agrimson stated that he was confident that staff were aware of the level of service they were expected to provide, and if any unprofessional conduct occurred it would be dealt with timely.  Allen wrote a letter in response to Agrimson's April 4, 2007 letter, asking for a more accurate response regarding his pain, suffering, and additional surgery that resulted from the negligence of

---

[5]     It is unclear to the Court why this grievance was not included by the DOC Defendants in their motion, although the Court observes that the grievance is self-styled and not written on the grievance form provided by MCF-Oak Park Heights.  See Exhibits to Complaint, p. 30.  Nonetheless, Allen attached the response he received to this grievance (Exhibits to Complaint, pp. 38, 42), and in his response to the DOC Defendants' motion he does not contend that he appealed that response.  As such, the Court presumes it has a full record before it as to the November 20, 2006 grievance.

the medical staff.  Id., p. 44.  Agrimson responded by letter on May 24, 2007, and reported that he reviewed Allen's medical file and discussed Allen's health care concerns with Dr. Craane.  Id., p. 47.  Agrimson determined that necessary instructions regarding post-operative care were provided to Allen, health care staff had followed Allen frequently, and he was confident the medical care being given to Allen was very good.  Id.

On May 29, 2007, Allen filed a grievance stating that he informed Nurse Lisa Drummond that he was in pain due to surgery he had earlier that day, and requested supplies to care for his wound and time to take a sitz bath in the unit whirlpool.  Ebeling Aff., Ex. B (Grievance Report dated July 10, 2007).  Allen stated that Nurse Drummond denied these requests, and that he believed the portable sitz basin he received was unsanitary due to water going on the floor of his cell.  Id.  On June 1, 2007, Allen spoke with Dr. Craane and Nurse Supervisor J. Bauman about his wound treatment supplies and sitz bath, and stated that due to Nurse Drummond's conduct, he was forced to wear the same wound dressing for the first 3 ½ days following his surgery, exposing him to the possibility of infection.  Id.  Allen requested that Nurse Drummond be disciplined by leave without pay and a letter of reprimand, and requested that her conduct be investigated.  Id.

In response, Allen received a prescription for Vicodin and Motrin, teaching was performed regarding sitz baths, Allen was given supplies to wash and clean the surgical area on May 31, 2007, and authorization for daily tub baths after a reevaluation by Allen's physician on June 1, 2007.  Id.  Prior to June 1, 2007, the use of the tub was not medically authorized.  Id.  Allen's grievance was denied by Joan Bauman on July 10,

2007, who found that documentation supported that Allen was administered appropriate medical care.  Id.

Allen did not appeal any of these grievances.  Ebeling Aff., ¶ 3.  In his response to defendants' motion, Allen stated that whenever he filed a grievance, the issue would be answered with medical action.  Pl. Response, p. 13 [Docket No. 85].  According to Allen, because of the actions taken by prison officials after he filed his grievances, there was no need to appeal the decisions, but that did not excuse the deliberate indifference to his medical needs.  Id., p. 14.  Allen further argued that when he was transferred back to federal custody, he was without the forms he needed to exhaust the issues he intended to pursue, and that pursuit of his grievance through the federal grievance system would have been fruitless because federal authorities were not responsible.  Id.

Allen's last grievance was decided on July 10, 2007.  Allen was not transferred back to federal custody until October 3, 2007.  Therefore, Allen's argument that his transfer interfered with his ability to appeal the grievances is without merit – he had almost three months to appeal while he was still at MCF-Oak Park Heights, and yet he did not.  Furthermore, Allen filed no grievances at all related to two of his claims, retaliatory transfer and failure to send his medical records to USP-Coleman.[6]

Additionally, although Allen asserted that he was without access to the forms he needed, he never described the forms he required, the efforts he made to obtain the forms, or whether he was actually denied access to the administrative remedy forms.  It is true that "inmates cannot be held to the exhaustion requirement of the PLRA when

---

[6]     After his transfer, Allen did not file any grievances through MNDOC nor through the U.S. Bureau of Prisons administrative remedy procedure.  See Report and Recommendation dated February 12, 2010, pp. 10-13.

prison officials have prevented them from exhausting their administrative remedies." Lyon v. Vande Krol, 305 F.3d 806, 808 (8th Cir. 2002); Miller v. Norris, 247 F.3d 736, 740 (8th Cir. 2001) ("a remedy that prison officials prevent a prisoner from 'utiliz[ing]' is not an 'available' remedy under § 1997e(a)."). It is for this reason the Eighth Circuit has excused inmates from complying with an institution's grievance proceedings in two circumstances: "when prison officials have prevented prisoners from utilizing the procedures, or when officials themselves have failed to comply with the grievance procedures." Gibson v. Weber, 431 F.3d 339, 341 (8th Cir. 2005) (internal citations omitted).

However, this is not a case where Allen was unaware of the grievance procedure or misunderstood it, or where prison officials thwarted his attempts to file a grievance. "[A] plaintiff must present some evidence, other than mere conclusory statements, to demonstrate that he was precluded from fully exhausting his administrative remedies." Gisege v. Minnesota Dept. of Corrections, 2007 WL 2892024 at *11 (D.Minn. Sept. 28, 2007). See also Gibson, 431 F.3d at 341 (upholding summary judgment where plaintiffs presented no evidence that any prison official thwarted an attempt to initiate the procedures or that any official made it impossible for them to file grievances); Boyles v. Park, 111 Fed.Appx. 861 (8th Cir. 2004) ("Further, while there was some evidence in the record below about problems with the grievance process, the evidence was not specific enough to show that prison officials had prevented Boyles from administratively exhausting the issues he raised in the instant lawsuit."); Sergent v. Norris, 330 F.3d 1084, 1085-86 (8th Cir. 2003) (per curiam) (finding no evidence in record that inmate was prevented from effectively utilizing grievance procedures); Chelette v. Harris, 229

F.3d 684, 688 (8th Cir. 2000), cert. denied, 531 U.S. 1156 (2001) ("if administrative remedies are available, the prisoner must exhaust them," regardless of his subjective beliefs about their availability). See also Maddix v. Crawford, 216 Fed. Appx. 605, 606 (8th Cir. 2007) (unpublished) (claims properly dismissed for failure to exhaust administrative remedies because record did not support plaintiff's assertion that his attempt to exhaust his claims were thwarted by defendants). Allen's suggestion that he could not file a grievance because he was without access to the forms he needed to exhaust his remedies is not supported by any evidence and will not excuse his obligation to exhaust his remedies.

Upon review of all evidence and exhibits offered by the parties, the Court finds that Allen did not appeal any of his grievances, and therefore, did not exhaust his administrative remedies against the DOC Defendants concerning his alleged retaliatory transfer, failure to send Allen's medical records to USP-Coleman, and inadequate medical treatment.

Having determined that Allen has not exhausted all available administrative remedies as to any of his constitutional claims against the DOC Defendants, this action must be dismissed. The only remaining issue for this Court to consider is whether the action should be dismissed with or without prejudice. Here, because the time has run on Allen's ability to grieve his complaints against the DOC Defendants, Woodford makes clear that the remedies are no longer available. Under the Minnesota Department of Corrections' policy, an offender must appeal within 15 working days of the date the warden, superintendent or designee signed the response to the offender's grievance. The deadline for Allen to appeal has long passed. Thus, because Allen can

no longer exhaust his claims, he has procedurally defaulted on them and his suit is precluded forever and must be dismissed with prejudice. See Woodford, 548 U.S. at 92-93; Johnson v. Meadows, 418 F.3d 1152, 1156 (11th Cir. 2005) (noting the "policies favoring exhaustion," court held that the PLRA contains a procedural default component where an inmate fails to avail himself in a timely fashion of the institution's administrative process); Berry v. Kerik, 366 F.3d 85, 88 (2nd Cir. 2004) ("failure to pursue administrative remedies while they were available precluded [the plaintiff's] federal lawsuits, and they were properly dismissed with prejudice."); Wardrick v. Marberry, NO. CIV.A. 06-216-ERIE, 2007 WL 4180693 at *6 (W.D. Pa. Nov. 20, 2007) ("Plaintiff has failed to exhaust his administrative remedies. In addition, Plaintiff is foreclosed from re-submitting his appeal to the General Counsel's Office because he failed to do so within the required time period. As a result, Plaintiff has procedurally defaulted on his claim and this case should be dismissed"); see also Carini v. Austin, 2008 WL 151555 (S.D.N.Y. Jan. 14, 2008) (dismissed case with prejudice by former inmate where he had ample opportunity to exhaust remedies before he was released).

In summary, in the face of specific evidence that Allen did not follow the required administrative remedy procedure to assert his claims against the DOC Defendants, the Court finds that he has failed to exhaust his administrative remedies and his case against the DOC Defendants must be dismissed in its entirety with prejudice.

## IV. DEFENDANT STEPHEN CRAANE, M.D.'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 55] AND DEFENDANTS DR. MICHAEL KOEPLIN AND DR. JOSHUA COLTON'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 61]

### A.  Factual Background

The following undisputed facts are relevant to the allegations Allen makes against Dr. Craane, Dr. Koeplin, and Dr. Colton.

Correctional Medical Services ("CMS") is a private corporation that contracts with the Minnesota Department of Corrections to provide the services of physicians and other healthcare providers to correctional facilities in Minnesota, including MCF-Oak Park Heights . Affidavit of Stephen Craane, M.D. ("Craane Aff."), ¶ 4. At all relevant times, Dr. Craane contracted with CMS to provide medical services at MCF-Oak Park Heights. Id., ¶ 2. CMS physicians are not subject to MNDOC policies regarding the practice of medicine. Id., ¶ 5. MNDOC administers the health services units in correctional facilities and provides staff for the health service units. Id., ¶ 7. CMS physicians have no control over MNDOC employees, and CMS physicians do not create, administer or apply DOC policies related to the administration of health services at the correctional facilities. Id., ¶¶ 8-9.

Dr. Michael Koeplin is a physician who practices with Minnesota Surgical Associates, P.A. Affidavit of Dr. Michael Koeplin ("Koeplin Aff."), ¶ 1. Minnesota Surgical Associates, P.A. has an agreement with MNDOC to provide off-site medical care to prisoners. Id. Dr. Joshua Colton is a physician who practices with Minnesota Gastroenterology, P.A., which also has an agreement with MNDOC to provide off-site medical care to prisoners. Affidavit of Dr. Joshua Colton ("Colton Aff."), ¶ 1.

On February 7, 2007, Dr. Koeplin saw Allen regarding surgical intervention of hemorrhoids.  Koeplin Aff., ¶ 2; Affidavit of Bryon G. Ascheman ("Ascheman Aff."), Ex. 1 (Dr. Koeplin's treatment notes from February 7, 2006).  Dr. Koeplin offered to excise the hemorrhoids.  Id.  On March 16, 2006, Dr. Koeplin performed surgery on Allen at St. Joseph's Hospital in St. Paul, Minnesota, to excise the hemorrhoids.  Koeplin Aff., ¶ 4; Ascheman Aff., Ex. 2 (Dr. Koeplin's operative report from March 16, 2006).  Dr. Koeplin saw no other hemorrhoids besides those he excised.  Koeplin Aff., ¶ 4.  Allen was prescribed Vicodin, Colace and sitz baths three times per day upon his discharge.  Id.; Ascheman Aff., Ex. 3 (discharge instructions).

Dr. Craane provided care to Allen beginning in or about March of 2005 and continuing to September of 2007.  Craane Aff., ¶ 10.  Allen was housed in the Transitional Care Unit ("TCU") at MCF-Oak Park Heights from March 1, 2006 to April 4, 2006.  Craane Aff., ¶ 12.  Following his surgery, Allen was seen by Dr. Craane on March 16, 17, 21, 22, 23, 24, 27, 28, 29, 30 and 31, 2006.  Id.  Over that time, Dr. Craane modified Allen's analgesic regimen to include ibuprofen in addition to Vicodin, examined Allen's surgical site, obtained a complete blood count, and monitored and authorized a special diet.  Id.; Hardy Aff., Ex. A, documents DOC 270 (treatment notes from March 16, 2006), DOC 272 (treatment notes from March 17, 2006), DOC 273 (treatment notes from March 21, 2006), DOC 274 (treatment notes from March 22, 2006), DOC 275 (treatment notes from March 23, 2006), DOC 277 (treatment notes from March 24, 2006), DOC 278 (treatment notes from March 27 and March 28, 2006), DOC 279 (treatment notes from March 29, 2006), DOC 280 (treatment notes from March 30, 2006), and DOC 281 (treatment notes from March 31, 2006).

On April 4, 2006, Allen was transported to St. Joseph's Hospital to be seen by Dr. Koeplin for a follow-up to his March 16, 2006 surgery. Ascheman Aff., Ex. 4 (Dr. Koeplin's report from April 4, 2006). Dr. Koeplin felt that Allen's pain at that time was not unexpected, and recommended continued sitz baths. Koeplin Aff., ¶ 5.

On April 25, 2006, Dr. Craane examined Allen; the examination revealed good healing at and about anal opening, but a pair of 4 mm ulcerations were noted at the anterior and posterior aspects of the perirectal area. Id., ¶ 16; Hardy Aff., Ex. A, document DOC 43 (treatment notes from April 25, 2006). The lacerations were not draining or bleeding, and Dr. Craane continued Allen on oral antibiotics and topical antiobotic salve, and prescribed Ultram for pain. Craane Aff., ¶ 16. Allen was not performing sitz baths as ordered, and complained he could not fit the sitz bath attachment into the toilet in his cell. Id. On April 25, 2006 Dr. Craane spoke with a DOC nursing supervisor regarding arrangements for Allen's sitz baths. Id., ¶ 17.

Dr. Craane saw Allen again on May 4, 2006; Allen continued to complain of pain at the surgical site, but reported improvement in the pain after starting on Ultram. Craane Aff., ¶ 18; Hardy Aff., Ex. A, document DOC 44 (treatment notes from May 4, 2006). Allen also reported that the drainage rate improved but that he still occasionally experienced bleeding, and that he still had difficulties fitting the sitz bath attachment into the toilet in his cell. Craane Aff., ¶ 18.

Dr. Craane next saw Allen on May 18, 2006, and noted two superficial ulcerations. Craane Aff., ¶ 20; Hardy Aff., Ex. A, document DOC 45 (treatment note from May 18, 2006). No associated draining or bleeding was noted. Craane Aff., ¶ 20. Allen's inferior wound continued to heal well but his superior wound was healing less

well, and Dr. Craane encouraged Allen to keep the area clean and planned to continue the current medical management and analgesic regimen.  Id.

Allen was seen for a follow-up by Nurse Practitioner Judy Ellerbusch on June 2, 2006, and continued to complain of pain.  Craane Aff., ¶ 21; Hardy Aff., Ex. A, document DOC 46 (treatment note from June 2, 2006).  Ellerbusch consulted with Dr. Craane and provided Allen with viscous Lidocaine as a topical treatment for his pain.  Craane Aff., ¶ 21.

Ellerbusch again saw Allen on June 9, 2006; Allen complained that the Lidocaine caused a burning sensation and he had sicontinued its use.  Craane Aff., ¶ 22, Hardy Aff., Ex. A, document DOC 46 (treatment note from June 9, 2006).  Ellerbusch encouraged Allen to use the Lidocaine in smaller amounts.  Craane Aff., ¶ 22.

Ellerbusch saw Allen again on July 7, 2006.  Craane Aff., ¶ 23; Hardy Aff., Ex. A, document DOC 47 (treatment note from July 7, 2006).  Ellerbusch noted that Allen's wounds were healing and there was no reddened tissue.  Craane Aff., ¶ 23.

On August 4, 2006, Ellerbusch consulted with Dr. Craane regarding drainage of Allen's wound; a culture was obtained and Allen was prescribed the antibiotic Cipro and a request for consultation with Dr. Koeplin at St. Joseph's Hospital was made.  Craane Aff., ¶ 24; Hardy Aff., Ex. A, document DOC 48 (treatment note from August 4, 2006).

On August 22, 2006, Dr. Koeplin saw Allen and diagnosed an anal fissure and recommended surgery.  Koeplin Aff., ¶ 6; Ascheman Aff., Ex. 6 (Dr. Koeplin's report from August 22, 2006).

On August 24, 2006, Dr. Craane saw Allen and noted a fissure and mild amount of cloudy drainage, and started Allen on a course of Clindamycin for the drainage.

Craane Aff., ¶ 26; Hardy Aff., Ex. A, document DOC 49 (treatment note from August 24, 2006).

On September 1, 2006, Dr. Koeplin performed a lateral internal sphincterotomy and polpyectomy. Koeplin Aff., ¶ 7; Ascheman Aff., Ex. 7 (Dr. Koeplin's operative report from September 1, 2006). Dr. Koeplin did not note any hemorrhoids during the procedure, and would have excised any he had noted. Koeplin Aff., ¶ 7.

Dr. Craane saw Allen on September 15, 2006; Allen reported his wound was healing well and requested an authorization for sitz baths. Craane Aff., ¶ 28; Hardy Aff., Ex. A, document DOC 50 (treatment note from September 15, 2006). Dr. Craane had already written an order for continuation of sitz baths two days prior to this visit. Craane Aff., ¶ 28; Hardy Aff., Ex. A, document DOC 84 (written order for sitz baths).

On October 4, 2006, Allen complained to Dr. Craane about pain associated with the surgical site, but also stated he believed his wound was healing. Craane Aff., ¶ 29; Hardy Aff., Ex. A, no document stamp (treatment note from October 4, 2006). Allen had been performing sitz baths as directed, and examination of Allen's perineal area revealed no drainage or bleeding. Craane Aff., ¶ 29. Dr. Craane planned to start Allen on milk of magnesia in response to his complaints of constipation. Id.

On November 2, 2006, Allen reported to Dr. Craane that he experienced additional bleeding several days prior to the visit, but had not noted any bleeding for more than a month prior to that episode, and no further bleeding since. Craane Aff., ¶ 30; Hardy Aff., Ex. A, no document stamp (treatment note from November 2, 2006). Dr. Craane suspected an additional internal hemorrhoid and instructed Allen to notify the clinic if he experienced further bleeding. Craane Aff., ¶ 30.

Dr. Craane saw Allen on November 9, 2006. Craane Aff., ¶ 31. Allen complained of bleeding, and examination showed four individual internal hemorrhoids. Id.; Hardy Aff., Ex. A, document DOC 52 (treatment note from November 9, 2006). Dr. Craane filed an additional request for offsite evaluation by Dr. Koeplin. Craane Aff., ¶ 31.

On November 21, 2006, Allen was transported to St. Joseph's Hospital for an outpatient evaluation by Dr. Koeplin, who recommended a colonoscopy. Koeplin Aff., ¶ 8; Ascheman Aff., Ex. 8 (Dr. Koeplin's treatment notes from November 21, 2006). Dr. Koeplin could not feel any hemorrhoids upon examination. Koeplin Aff., ¶ 8. On January 3, 2007, Allen had a colonoscopy performed by Dr. Colton, who observed an irritated anal canal, which he attributed to hemorrhoids, and a diminutive descending colon polyp that was resected during the procedure. Affidavit of Dr. Joshua Colton ("Colton Aff."), ¶¶ 2-3, 5-6; Ascheman Aff., Ex. 9 (Dr. Colton's report from January 3, 2007). The colonoscopy was routine and completed without incident. Colton Aff., ¶ 7.

Dr. Craane saw Allen on January 18, 2007; Allen continued to complain of episodes of rectal bleeding. Craane Aff., ¶ 34; Hardy Aff., Ex. A, document DOC 54 (treatment note from January 18, 2007). Dr. Craane ordered a complete blood count on that date and in one month's time to ascertain the degree of blood loss, and planned to discuss Allen's condition with Dr. Koeplin to determine the best course of action. Craane Aff., ¶ 34.

On February 12, 2007, Allen continued to complain to Dr. Craane about pain and bleeding, and Dr. Craane planned to obtain another complete blood count. Craane Aff., ¶ 35; Hardy Aff., Ex. A., document DOC 55 (treatment note from February 12, 2007).

Dr. Craane saw Allen on March 7, 2007, and Allen complained of ongoing constipation.  Craane Aff., ¶ 36; Hardy Aff., Ex. A., document DOC 56 (treatment note from March 7, 2007).  Dr. Craane placed Allen on Reglan 10 mg three times per day in an effort to improve the condition.  Craane Aff., ¶ 36.

Dr. Craane next saw Allen on April 17, 2007.  Craane Aff., ¶ 37; Hardy Aff., Ex. A., document DOC 58 (treatment note from April 17, 2007).  Allen complained of discomfort associated with his hemorrhoids, and continued constipation despite the Reglan.  Craane Aff., ¶ 37.  Allen stated that he wanted the surgeon to reevaluate his condition, so Dr. Craane filed a second offsite request for authorization to have Dr. Koeplin see Allen.  Id.

On April 24, 2007, Allen reported no improvement in his condition and occasional bleeding to Dr. Craane.  Craane Aff., ¶ 38; Hardy Aff., Ex. A., document DOC 59 (treatment note from April 24, 2007).  Dr. Craane planned to obtain a complete blood count to determine Allen's blood loss.  Craane Aff., ¶ 38.

Allen was seen by Dr. Koeplin at St. Joseph's Hospital on May 1, 2007.  Koeplin Aff., ¶ 10; Ascheman Aff., Ex. 10 (Dr. Koeplin's treatment note from May 1, 2007).  Dr. Koeplin found no external hemorrhoids upon examination and was not able to visualize any fissure during the exam.  Koeplin Aff., ¶ 10.  Dr. Koeplin suspected recurrence of an anal fissure and recommended an exam under anesthesia with possible sphincterotomy and possible repeat hemorrhoidectomy.  Id.

On May 29, 2007, Dr. Koeplin performed another procedure on Allen at St. Joseph's under general anesthesia, and two hemorrhoids that had developed were

excised.  Koeplin Aff., ¶ 11; Ascheman Aff., Ex. 11 (Dr. Koeplin's operative report from May 29, 2007).

Dr. Koeplin saw Allen for a follow-up on June 19, 2007.  Koeplin Aff., ¶ 12; Ascheman Aff., Ex. 12 (Dr. Koeplin's treatment note from June 19, 2007).  Allen indicated continued bleeding, and Dr. Koeplin recommended a sitz bath twice daily and Vicodin.  Id.

Dr. Craane examined Allen on August 20, 2007.  Craane Aff., ¶ 43; Hardy Aff., Ex. A., document DOC 60 (treatment note from August 20, 2007).  The exam revealed that Allen's perineal area was moderately inflamed and slightly raw, and a moderate amount of scar tissue was noted.  Craane Aff., ¶ 43.  There was no drainage or bleeding.  Id.  Dr. Craane ordered extra washcloths to use for cleansing and told Allen that he would file an offsite request to have his fissure evaluated by a surgeon.  Id.

On September 17, 2007, Allen was seen by Dr. Koeplin at St. Joseph's Hospital for a surgical consultation.  Koeplin Aff., ¶ 13; Ascheman Aff., Ex. 13 (Dr. Koeplin's treatment notes from September 17, 2007).  Dr. Koeplin diagnosed a persistent anal fissure and recommended an exam under anesthesia with a possible lateral internal sphincterotomy.  Id.

Dr. Craane saw Allen on September 27, 2007.  Craane Aff., ¶ 45; Hardy Aff., Ex. A., document DOC 62 (treatment notes from September 27, 2007).  Allen requested individually-packaged wipes for personal hygiene and milk of magnesia.  Craane Aff., ¶ 45.  Dr. Craane advised Allen to continue to use washcloths to clean the perineal area, and placed Allen on Metamucil and Colace because stimulant laxatives should be avoided in the presence of a fissure.  Id.

Dr. Craane and Drs. Koeplin and Colton ("Physician Defendants") all brought motions for summary judgment pursuant to Rule 56. [Docket Nos. 55 and 61]. Dr. Craane argued that Allen failed to produce evidence that raises a genuine issue of material fact in support of his Eighth Amendment medical needs claim and failed to establish a genuine issue of material fact to support his claim that Dr. Craane was deliberately indifferent to a serious medical need. Craane Mem. in Support, pp. 17-25. Drs. Koeplin and Colton similarly contended that the claims against them must be dismissed because there was no evidence that either of them acted with deliberate indifference. Koeplin and Colton Mem. in Support, pp. 9-12.[7]

**B.    Discussion**

Allen's claims against the Physician Defendants generally allege deliberate indifference to his medical needs. See Complaint, pp. 3, 12-26. With regard to Dr. Koeplin, Allen claimed that Dr. Koeplin performed inadequate surgery procedures and that "Dr. Koeplin knew or should have known that the medical treatment rendered to

---

[7]    The Physician Defendants did not argue for summary judgment on the grounds that Allen failed to exhaust his administrative remedies. Despite having recommended dismissal of Allen's claims against the DOC Defendants on this ground, the Court cannot sua sponte recommend summary judgment on the claims against the Physician Defendants based on administrative exhaustion because the Physician Defendants did not raise the issue. Administrative exhaustion is an affirmative defense that must be raised by defendants. "[F]ailure to exhaust is an affirmative defense under the PLRA, and…inmates are not required to specially plead or demonstrate exhaustion in their complaints." Jones v. Bock, 549 U.S. 199, 211 (2007). See also Foulk v. Charrier, 262 F.3d 687, 697 (8th Cir. 2001) ("[T]he assertion that a plaintiff prisoner failed to exhaust all available administrative remedies as required under the PLRA is an affirmative defense under Fed.R.Civ.P. 8(c). It is the burden of the defendant asserting this affirmative defense to plead and prove it."); Guerra v. Kempker, 134 Fed. Appx. 112 (8th Cir. 2005) (unpub. per curiam) (citing Nerness v. Johnson, 401 F.3d 874, 876 (8th Cir. 2005) (per curiam)) (district court erred in dismissing complaint sua sponte for failure to exhaust administrative remedies; failure to exhaust is an affirmative defense, and plaintiff need not plead that he has exhausted his remedies in order to avoid pre-service dismissal).

Allen was in violation of Allen's Constitutional rights, protected by the Eighth Amendment." Complaint, ¶ 7, p. 28. Allen did not make specific allegations against Dr. Craane or Dr. Colton in the Complaint.

> It is well established that "[d]eliberate indifference to a prisoner's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment." See Gordon ex rel. Gordon v. Frank, 454 F.3d 858, 862 (8th Cir.2006) (citing Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)). "To show deliberate indifference, plaintiffs must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it." Id. (citing Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir.2005)). Prisoners may prove deliberate indifference by showing that the total deprivation of medical care resulted in "pain and suffering" or "a lingering death." Estelle, 429 U.S. at 103. But a total deprivation of care is not a necessary condition for finding a constitutional violation: "Grossly incompetent or inadequate care can [also] constitute deliberate indifference, as can a doctor's decision to take an easier and less efficacious course of treatment." Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir.1990) (citations omitted). To state a claim based on "inadequate medical treatment ... [t]he plaintiff 'must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.' " Alberson v. Norris, 458 F.3d 762, 765 (8th Cir.2006) (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir.1995)).

Langford v. Norris, ---- F.3d ----, 2010 WL 2813551 at *10 (8th Cir. 2010).

"A prima facie case alleging deliberate indifference requires the inmate-plaintiff to demonstrate that [he] suffered from an objectively serious medical need and the 'prison officials actually knew of but deliberately disregarded' that need." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008) (citing Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006)). A serious medical need is "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." Vaughn v. Greene County, Ark., 438 F.3d 845, 851 (8th Cir. 2006). It is undisputed that Allen's hemorrhoids constituted a serious medical need.

Accordingly, the Court must determine whether the evidence presented by Allen creates a material dispute of fact regarding whether the Physician Defendants knew of but deliberately disregarded that need.

Allen argued that although he received medical treatment, it was defendants' delay in the treatment and their failure to promptly respond to his requests that left him to suffer constant pain, and as such, he has sufficiently stated a claim of deliberate indifference. Allen Response, p. 9 [Docket Nos. 85, 86, 88]. Allen further contended that defendants knew that he both external and internal hemorrhoids that needed to be excised, despite their claim that the hemorrhoids were not noticed until later, and the ignorance of the existence of the hemorrhoids amounted to deliberate indifference. Id., p. 12.

Allen has not produced any evidence that the Physician Defendants knew of and disregarded his hemorrhoids. To the contrary, the record is replete with Allen's numerous visits with Dr. Craane and Dr. Koeplin and their plans for treating Allen's hemorrhoids. Dr. Koeplin stated that on during Allen's hemorrhoidectomy on March 16, 2006, he saw no other hemorrhoids besides those he excised, and would have removed other hemorrhoids if he had seen them. Koeplin Aff., ¶ 4. On September 1, 2006, Dr. Koeplin again did not note any hemorrhoids during an examination under anesthesia and stated he would have excised them as part of the surgery. Id., ¶ 7. On May 29, 2007, Dr. Koeplin performed another examination under anesthesia and excised hemorrhoids that had developed, stating that he saw no other hemorrhoids and would have excised them if he had seen any. Id., ¶ 11. Allen has offered no evidence to rebut

Dr. Koeplin's affidavit and support his claim that Dr. Koeplin knew of additional hemorrhoids and ignored them.

With respect to Dr. Colton, he performed one routine colonoscopy on Allen at the request of Dr. Koeplin. Allen has offered no evidence to suggest that Dr. Colton did not perform this colonoscopy properly.

Finally, Allen presented no evidence that Dr. Craane knew of hemorrhoids and was deliberately indifferent to them. The record shows instead that each time Dr. Craane suspected that Allen had developed additional hemorrhoids or found hemorrhoids, he filed a request for offsite authorization for an examination by Dr. Koeplin. Craane Aff., ¶¶ 24, 30-31, 37.

Nothing in the medical record indicates that Allen's condition went untreated, or that any of his complaints fell on deaf ears. Furthermore, Allen has presented no evidence that his hemorrhoids were worsened because of the alleged delay in treatment. See Senty-Haugen v. Goodno, 462 F.3d 876, 890 (8th Cir. 2006) (where plaintiff asserted that the state officials delayed treatment to his heart condition, broken leg, and inflamed cyst and that the delay amounted to deliberate indifference to his medical needs, summary judgment upheld because plaintiff failed to present any evidence that the alleged delays in treatment worsened his conditions and because he did not provide any expert evidence that the treatment he received was inadequate).

Allen's mere contentions that he received inadequate treatment, without more, are insufficient to form a constitutional violation. "Prisoners do not have a constitutional right to any particular type of treatment. Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to

implement a prisoner's requested course of treatment." <u>Long v. Nix</u>, 86 F.3d 761, 765 (8th Cir. 1996). A prisoner's difference of opinion over matters of expert medical judgment or a prescribed course of treatment does not rise to the level of a constitutional violation. <u>Randall v. Wyrick</u>, 642 F.2d 304, 308 (8th Cir. 1981).

Given the complete lack of evidence to support his claims of deliberate indifference, Allen's claims against Drs. Koeplin, Craane and Colton cannot survive summary judgment. <u>See</u> <u>Popoalii</u>, 512 F.3d at 499-500 (plaintiff had serious medical condition of cryptococcal meningitis, but where she presented no evidence to show that the defendants were more than grossly negligent and the facts in the record did not rise to the level of deliberate indifference, summary judgment in favor of defendants was upheld). Furthermore, "[w]here the complaint involves treatment of a prisoner's sophisticated medical condition, expert testimony is required to show proof of causation." <u>Alberson</u>, 458 F.3d at 765-66 (citing <u>Gibson v. Weber</u>, 433 F.3d 642, 646 (8th Cir. 2006)). "When an injury is sophisticated, proof of causation generally must be established by expert testimony. A causal connection between an event and an injury may be inferred in cases in which a visible injury or a sudden onset of an injury occurs. However, when the injury is a sophisticated one, <u>i.e.</u>, requiring surgical intervention or other highly scientific technique for diagnosis, proof of causation is not within the realm of lay understanding and must be established through expert testimony." <u>Robinson v. Hager</u>, 292 F.3d 560, 564 (8th Cir. 2002).

Allen's medical condition was sophisticated – he required three separate surgeries and a colonoscopy. Allen produced neither expert testimony nor documentary evidence to support his claim that the treatment provided by the Physician Defendants

was constitutionally inadequate. All three Physician Defendants, however, provided affidavits attesting that the treatment provided by each of them was adequate. "In the face of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." <u>Dulany v. Carnahan</u>, 132 F.3d 1234, 1240 (8th Cir. 1997).

Where no evidence whatsoever was submitted to support Allen's claims of deliberate indifference, the summary judgment motions of the Physician Defendants should be granted.

## V.    RECOMMENDATION

For the reasons set forth above, and based on all the files, records, and proceedings herein, IT IS HEREBY RECOMMENDED THAT:

1.    The Motion to Dismiss and for Summary Judgment of Defendants Agrimson, Helmaniak, Jonk, Larson, Nelson, Reid, Symmes, Tagawa, and Thielen [Docket No. 46] be GRANTED;

2.    Defendant Stephen Craane, M.D.'s Motion for Summary Judgment [Docket No. 55], be GRANTED; and

3.    Defendants Dr. Michael Koeplin and Dr. Joshua Colton's Motion for Summary Judgment [Docket No. 61] be GRANTED.


Dated:    August 4, 2010


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

**<u>NOTICE</u>**

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 18, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.

Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 18, 2010**.